IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| Eric R. Smalley, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:23cv913 (RDA/WEF) |
| ) | |
| Hall, *et al.*, ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Plaintiff Eric R. Smalley ("Plaintiff" or "Smalley"), a Virginia inmate proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 alleging that defendants—L. Hall, I. Rivers, K.C. Mitchell-Tyler, and Lt. Williams—violated his Eighth Amendment rights because they failed to protect him from an assault while he was detained at the Sussex II State Prison, Waverly, Virginia. Specifically, during September and October 2021, Smalley alleges that he requested that he be placed in the SAM's Unit, a special housing unit, because: other inmates knew he was a sex offender; that he is bi-polar and has other mental health issues; he had a timid personality that made him susceptible to bullying and extortion; and that he had been "extorted" at his previous institution. Dkt. 2 at 10-11; Dkt. 2-4. Smalley alleges that Defendants refused to refer him to the SAMS Unit (specifically on September 8, 2021 and October 20, 2021), and that he was subsequently sexually assaulted by his cellmate on October 28 through October 30, 2021. *Id.*

On August 24, 2024, Defendants Hall, Rivers, and Mitchell-Tyler ("three Defendants") filed a motion for summary judgment, with a brief in support, with exhibits and affidavits.[1] Dkts. 30-35. The three Defendants assert judgment should be entered in their favor because Plaintiff has

---

[1] The fourth defendant, Lt. Williams, is in the process of obtaining counsel and has not yet noted her appearance. Defendant Williams will be addressed separately.

failed to establish any of the three Defendants were deliberately indifferent because there is no evidence in the summary judgment record that any of the three Defendants disregarded a specific excessive risk to Plaintiff's safety when they refused to refer him for placement in the SAM's Unit; and the three Defendants had no authority over where an inmate is housed. Dkt. 35 at 8, 9. After being advised of his right to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), Plaintiff exercised his opportunity and filed a Motion to Dismiss Motion for Summary Judgment. Dkt. 39.[2] The motion for summary judgment is ripe, and after reviewing the pleadings and the summary judgment record, the motion for summary judgment must be granted.

## II. Summary Judgement

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Fourth Circuit has noted, summary judgment allows courts "to avoid useless trials where material facts are not disputed and the law points unerringly to the conclusion that one of the parties is entitled to judgment as a matter of law," *Utility Control Corp. v. Prince William Constr. Co.*, 558 F.2d 716, 719 (4th Cir. 1977), and allows courts "to avoid a useless trial" and "make[s] possible the

---

[2] The Court notes that in compliance with Local Rule 7(K), the three Defendants provided Plaintiff with the notice required pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). *See* Dkt. 36. A recent Fourth Circuit decision, *Milla v. Brown*, 109 F.4th 222 (4th Cir. 2024), has cast doubt on whether former Local Rule 7(K), repealed on December 1, 2024, satisfies *Roseboro*, and a revised Rule 7(K) has been proposed accordingly. This Court further notes that Plaintiff responded to the three Defendants' Motion for Summary Judgment, after being advised of his right to do so as set forth in the three Defendants' *Roseboro* notice, *see* Dkt. 10, and therefore the Court does not view the *Milla* decision as an impediment to this Court issuing this order.

prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts." *Bland v. Norfolk & S.R. Co.*, 406 F.2d 863, 866 (4th Cir. 1969).

"[It] is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986) (citation omitted). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The three Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that they contend are undisputed. Plaintiff, however, has not complied with his obligations under those Rules by submitting statements of undisputed and disputed facts. *See Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court."); *Malina v. Baltimore Gas & Elec. Co.*, 18 F. Supp.2d 596, 604 (D. Md. 1998) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion. The court . . . is not required to independently comb the record to look for them."); *see also Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470-71 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute . . . . Nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment . . . .").

Accordingly, Plaintiff has failed to rebut any of the facts set forth by the three Defendants, *Gholson v. Murray*, 953 F. Supp. 709, 714 (E.D. Va. 1997), and the Court accepts the three Defendants' statement of facts as true. *See Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine facts in opposition to the motion.") (quoting E.D. Va. Loc. Civ. R. 56(B)), *aff'd*, 690 F. App'x 822 (4th Cir. 2017); *see also JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is deemed admitted where nonmovant's response fails to "identify with any specificity which facts, if any, were disputed") (citing E.D. Va. Loc. Civ. R. 56(B)).[3]

### III. Undisputed Statement of Facts

The following statement of uncontested facts is derived from a review of the three Defendants' statement of undisputed facts, and the summary judgment record.

1. At all relevant times, Plaintiff was incarcerated at the Virginia Department of Corrections' ("VDOC") Sussex II State Prison ("Sussex II"). Dkt. 2 at 1.

2. At all relevant times, Defendant Hall was a licensed Qualified Mental Health Professional ("QMHP"), employed by VDOC as a mental health clinician at Sussex II. Hall was not responsible for inmate custody assessments or housing assignments. Dkt. 35-1 at1.

---

[3] The summary judgment record of admissible evidence includes the affidavits and unobjected to documents submitted in support of the motion for summary judgment, Dkts. 30-32, 35-1 through 35-8, and Plaintiff's unobjected to documents submitted with the memorandum he submitted. Dkts. 2-1 through 2-7. Plaintiff submitted one affidavit in support of his complaint, Dkt. 2-4, which the three Defendants have not expressly addressed. Plaintiff's response to the motion for summary judgment, Dkt. 39, was not sworn. The Court has reviewed the Plaintiff's affidavit in determining the undisputed facts.

3. At all relevant times, Defendant Mitchell-Tyler was a case counselor, employed by VDOC at Sussex II. Mitchell-Tyler was not responsible for inmate custody assessments or housing assignments. Dkt. 35-2 at 1.

4. At all relevant times Defendant Rivers was a licensed QMHP and Sex Offender Provider, employed by VDOC as a mental health clinician at Sussex II. Rivers was not responsible for inmate custody assessments or housing assignments. Dkt. 35-3 at 1.

5. At all relevant times, Sussex II had a Shared Allied Management ("SAM") Unit. The SAM's Unit "is a residential pod intended to provide a safe environment for the delivery of intensive services to three inmate populations that typically require a high level of services from security, mental health, and/or medical department:

- Inmates with a mental health diagnosis that present management difficulties in GP or frequently cycle in and out of Special Housing and/or the licensed mental health units.
- Inmates with a medical condition requiring frequent nursing attention, but do not require admission to the infirmary.
- Inmates vulnerable to predation, bullying, or manipulation due to characteristics such as intellectual challenges, age, or size.

Dkt. 35-4 (SAM's Pod Operations Manual, "Manual").

6. The intent of the SAM's Unit is to promote safety and stability within the institution while avoiding the unnecessary use of the Restrictive Housing Unit ("RHU"), or an unnecessarily high demand for Security, Mental Health, and/or Medical Staff. Generally, these high demand inmates will be gathered in a single housing unit where specialized staff can efficiently deliver services towards the goals of increasing adaptive behaviors and improve the inmate's conditions of confinement in hopes of their return to general population or transfer to a lower security facility with appropriate services. *Id.* at 5.

7. The SAM's Unit is led by a committee that meets weekly to make decisions on admissions, removals, pathway assignments, treatment plans, and the overall status and stability of the SAM's Unit including operations and culture. *Id.*

8. The SAM's Unit houses 88 inmates that require these specialized services. It is not a protective custody pod or a pod for sex offenders. Dkt. 35-3 at 1.

9. Plaintiff is a convicted sex offender who has been incarcerated on charges of possession of child pornography, taking indecent liberties with a child, and aggravated sexual battery on a victim less than 13 years of age. Dkt. 30 at 1.

10. Plaintiff entered Sussex II on September 8, 2021. Dkt. 2 at 3.

11. Defendant Rivers conducted Plaintiff's Mental Health and Wellness Services Screening on September 8, 2021. She noted that Plaintiff was not at risk and had a mild mental health impairment. Dkts. 31 at 1; 30 at 1.

12. There is no indication from the Mental Health and Wellness Services Screening that Plaintiff expressed any concern or fear for his safety, and Defendant Rivers has no recollection of Plaintiff having expressed that he was fearful of any inmate(s). Dkts. 30 at 1; 35-3 at 1-2.

13. Rivers is not involved in classification or housing assignments.[4] If an inmate expresses fear at the intake screening, Rivers advises the inmate to speak with the Intelligence

---

[4] Plaintiff argues that the three Defendants are "in fact" involved in offender housing assignments. Dkt. 39 at 3. He cites to the Manual, which actually negates his argument. While the Manual states that "[a]ny institutional staff member may make an internal *referral* to the site's SAM Pod," Dkt. 35-4 at 16, ¶ 3(b) (emphasis added), that does not mean that "any staff" can have an inmate admitted to the SAM's Unit. To the contrary, there is a process involving at least one committee (the SAM's Committee) which takes several days because of the assessments that need to be made by the Institutional Classification Authority and a screening by the Central Classification Services staff, and final approval is necessary by the Chief of Housing and Planning. Finally, even after approval, an inmate might simply end up on a waiting list because of space availability issues. *See infra* at 11-12.

officer present at intake. If the officer is not present, she notifies Intelligence directly. Dkt. 35-3 at 1-2.

14. On September 10, 2021, Plaintiff avers that he approached Defendant Rivers in the gymnasium and asked her about being placed in the SAM's Unit. When asked why he thought he should be placed in the SAM's Unit, Plaintiff told her he is bi-polar and experiences other mental health issues; that he is a sex offender; that he was vulnerable to being extorted or sexually assaulted; and that he had been extorted at his previous institution. Dkt. 2-4 at 1. Rivers "declined" his request. *Id.*[5]

15. On October 19, 2021, Plaintiff was approached by "a gang member" who demanded that Plaintiff "pay for gang protection." *Id.* Plaintiff filed a grievance about the alleged extortion and was moved to a different housing unit on October 28, 2021.

---

[5] Rivers screened Plaintiff on September 8, 2021, and Plaintiff avers that he was screened on September 10, 2021. The discrepancy in dates is not material for purposes of resolving this motion. Although terse, Rivers' affidavit and Plaintiff's affidavit are not inconsistent with each other on the material facts related to the motion for summary judgment. Indeed, Plaintiff's affidavit makes no mention of anyone in a gang until October 19, 2021, which is over 40 days after he was screened by Rivers. Dkt. 2-4 at 1. Plaintiff filed a grievance about the gang member on October 26, 2021 and was moved on October 28, 2021. *Id.* Although he saw Hall on October 20, 2021, Plaintiff's affidavit does not mention that he informed either Rivers, Hall, or Tyler-Mitchell about the gang member and, as noted, he did not file the grievance until six days later on October 26, 2021. In addition, when Hall saw him on October 20, 2021, Plaintiff told her that he was "okay." Dkt. 31 at 2.

The summary judgment record establishes that Sussex II personnel responded appropriately and in a timely fashion when they were advised of specific threats. Plaintiff was sexually assaulted by his new cell mate (October 28 through October 30, 2021), informed a correctional officer on October 31, 2021, and was immediately separated and moved to a new cell in a different pod. *Id.* at 1-2. The telephone logs corroborated the timeline. Dkt. 32. Plaintiff does not aver that he identified any specific inmate when he spoke with Rivers at screening and related only a generalized fear that he might be extorted or sexually assaulted, all of which is consistent with Rivers' affidavit. Further, when Plaintiff notified correctional personnel (not any of the three Defendants) on October 26, 2021, via a grievance about the attempted extortion by a gang member, he was moved to a new cell within two days.

16. Defendant Hall has no recollection of seeing or speaking with Plaintiff at his mental health intake screening, which was conducted by Rivers. Dkt. 35-4 at 1-2.

17. Defendant Hall assessed Plaintiff on October 20, 2021, in his housing unit at 9:40 a.m. Plaintiff did not report fear of any inmate(s) or threats, nor did he request a housing transfer at that assessment. If an inmate expresses fear, Hall immediately notifies the building unit manager or the building Lieutenant or Sergeant. Dkt. 31 at 2; Dkt. 35-4 at 1-2. During that assessment, Plaintiff stated, "I am OK." Dkt. 2-2 at 1.

18. On that same date, Plaintiff submitted an Offender Request form to mental health requesting an appointment "to have a referral done for [him] to be in the SAM unit." Plaintiff set forth that he "fit the description of being 'victimized or bullied' due to [his] charges." He also set forth that he had a "timid personality," bi-polar disorder, and anti-social behavior. He added "[c]urrently I am being extorted as I said would happen when we first spoke." Plaintiff did not indicate that he was in fear of any inmate(s), identify who was extorting him, or that time was of the essence. Dkt. 35-7.

19. The Request Form was forwarded to Defendant Hall, who responded on November 8, 2021, that she would not refer him to the SAM's Unit because the SAM's Unit is not there to send an inmate to because of their crime. Dkt. 35-1 at 2; Dkt. 35-7.

20. Defendant Mitchell-Tyler has no recollection of an interaction with Plaintiff wherein he informed her that he was in fear of any inmate(s). If an inmate expresses fear, Mitchell-Tyler immediately notifies the building unit manager or the building Lieutenant or Sergeant. Dkt. 35-2 at 1.

21.     Mitchell-Tyler has a vague recollection that Plaintiff asked about her referring him to the SAM's Unit. At most, she would have informed him that he did not meet the criteria and those decisions were made by a committee. *Id.*

22.     During an October 26, 2021 phone call with his mother, Plaintiff told her about the gang member attempting to extort payment from him for protection, that he had filed a grievance, and would be moved to a new cell. Plaintiff did not say anything to his mother about being in fear of being moved to a new cell. Dkt. 35-8 at 1-2.

23.     On October 30, 2021, Plaintiff reported to the Watch Commander's office that he feared for his safety from Brown, and was immediately removed from the cell and reassigned. Brown was reclassified to the RHU, pending the investigation of the allegations. Dkt. 30 at 1.

24.     On October 31, 2021, at 4:20 p.m., during a telephone call with a female, Plaintiff told her that he had been moved to the veteran's pod, and that his cellmate had threatened him and his family. Dkt. 35-8 at 1.

25.     On October 31, 2021, at 8:44 p.m., during a call with his mother, Plaintiff mentioned the sexual assault and suggested that she inform the Warden or Intelligence about the assault. Dkt. 35-8 at 2.

26.     On November 1, 2021, at approximately 2:00 p.m., jail officials received a PREA (Prison Rape Elimination Act) hotline tip call from Plaintiff's mother, indicating that during a telephone call, Plaintiff told her that he had been threatened and sexually assaulted by his cell mate. Dkt. 30 at 1.

27.     Intelligence staff were made aware of the PREA complaint and interviewed Plaintiff, who disclosed that Brown had sexually assaulted him on the nights of October 28 and

30, 2021. Plaintiff reported that Brown threatened him and his family, stole documents and paperwork from him, and that he feared for his safety from Brown. *Id.* at 1-2.

28.     On November 6, 2021, Plaintiff filed a complaint stating that Defendants Rivers and Mitchell did not help him when he requested a referral to the SAM's Unit. Dkt. 2-1 at 1. M. Vandermark responded to the complaint on November 10, 2021, and informed Plaintiff that he must be referred to the SAMs Pod and that upon his "arrival" he "did not meet the criteria." *Id.*

## IV. Analysis

Plaintiff argues that because Defendants Hall, Rivers, and Mitchell-Tyler failed to refer him to the SAM's Unit, that he was sexually assaulted; *i.e.*, if the three Defendants had referred him to the SAM's Unit, he would not have been assaulted. The theory is severely flawed, unsubstantiated by the summary judgment record and the record actually establishes that none of the three Defendants had the authority to place Plaintiff (or any inmate) in the SAM's Unit. Moreover, there is no evidence that any of the three Defendants had any reason to believe Plaintiff was in danger of any assault from their limited contact with him.[6]

### A. Failure to Protect

The Eighth Amendment requires prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). However, "not every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. To establish a claim for failure

---

[6] Plaintiff argues that this Court cannot find that the three Defendants did not have the authority to have him "moved to" the SAM's Unit because they were not members of the SAM's Committee "that makes those decisions." Dkt. 39 at 4-5. Plaintiff's brief in opposition acknowledges the Manual but ignores the process set forth in the Manual that admitting an inmate into a SAM's Unit requires approval of the SAM's Committee. Moreover, the decision of the SAM's Committee to move an inmate must be approved by the Chief of Housing and Planning. *See infra* at 13.

to protect from violence, Plaintiff must show: (1) serious or significant physical or emotional injury and (2) that officials had a "sufficiently culpable state of mind." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003). The requisite state of mind is one of "'deliberate indifference' to inmate health or safety." *Id.* To be liable, the prison official "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Defendants must have exhibited "deliberate or callous indifference of prison officials to *specific known risks of such harm*." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (emphasis added).

To establish deliberate indifference, (1) "the evidence must show that the official in question subjectively recognized a substantial risk of harm;" and (2) the evidence in question must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). It is not enough that the official should have recognized that his actions were inappropriate; the official must have actually recognized that his actions were inappropriate. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) (holding that "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

> [T]he feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry. . . . As we often have made clear, the question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken—but whether they "*disregarded* an excessive risk to … health or safety." *Brown [v. Harris]*, 240 F.3d [383,] 390-91 [(4th Cir. 2001)] (noting that failure to take additional precautions showed, at most, negligence and not deliberate indifference.)

*Parrish*, 372 F.3d at 309. *Parrish* also observed that

> officials can be liable under the deliberate indifference standard only to the extent that they actually appreciate the risk factors in a given case, and only to the extent

>they make the *causal inference that the circumstances as they perceived them created a substantial risk of serious harm*. Holding officials accountable for risk factors that they did not actually recognize, while permissible if negligence were the standard of culpability, is not permissible when deliberate indifference is the standard.

*Id.* at 304 (emphasis added). In sum, "general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837).

The backdrop of many allegations that correctional officials failed to protect an inmate is the "unfortunate reality . . . that jails and prisons are dangerous places inhabited by violent people. The constitutional expectation 'is that guards act responsibly under the circumstances that confront them,' not that they anticipate every potential danger facing a [prisoner]." *Thomas v. Dart*, 39 F.4th 835, 842 (7th Cir. 2022) (citation omitted); *see also Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) ("prisons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more."). Thus, "[a]ny time an individual is incarcerated, there is some risk that he may be a victim of violence at the hands of fellow inmates . . . ." *Westmoreland v. Brown*, 883 F. Supp. 67, 74 (E.D. Va. 1995). Therefore, a baseline risk of assault inherent to prison life cannot support an Eighth Amendment claim. *See Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008).

"[A]s the vagueness of a threat increases, the likelihood of 'actual knowledge of impending harm' decreases." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (quoting *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005)). An inmate's "vague statements that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play." *Dale*, 548 F.3d at 569 (quoting *Grieveson*, 538 F.3d at 776)(holding that an inmate who "told jail officials only that he was afraid and that he wanted to be moved" failed to

12

put those officials on notice of an actionable threat). A failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005); *see Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (finding that statements by a prisoner that he was "having problems in the block" and "needed to be removed" were insufficient to establish deliberate indifference).

Here, there is no evidence that Defendants Hall, Rivers, or Mitchell-Tyler had any authority to have Plaintiff admitted to the SAM's Unit. While each could "make an internal referral to the" SAM's Unit," Dkt. 35-4 at 16, ¶ 3(b), that does not mean that any of the three Defendants could have Plaintiff admitted to the SAM's Unit. The steps required for admission to the SAM's Unit involve numerous persons and committees before an inmate is even considered by the SAM's Committee. Even then, the Chief of Housing and Programs must still approve of the inmate's admission. The Manual for admission to a SAM's Unit, which does not require a transfer to a different institution, provides that

> In order to recommend an inmate for assignment to a SAM Unit, designated institutional staff must prepare the Shared Allied Management (SAM) Unit Admission Screening 830_F8 for review and approval by the Chief of Housing and Programs (CHAP) of the SAM Unit.
>
> In order to assign an inmate to the SAM Unit at their current institution, an informal ICA [Institutional Classification Authority] hearing is required. Designated institutional staff must prepare the Shared Allied Management (SAM) Unit Admission Screening for review and approval by the institution's CHAP.
>
> \* \* \* \*
>
> The Psychology Associate Senior at CCS [Central Classification Services] or designee will review each recommended assignment and, *taking into consideration bed availability*, will make a determination on the appropriate institutional SAM Unit assignment. . . . The Psychology Associate Senior at CCS or designee will forward the SAM Admission Screening to the CHAP at the receiving SAM Unit for review and approval.
>
> Within 3 working days, the CHAP or their designee must make email notification to the Psychology Associate Senior at CCS or designee of their decision to either accept, *accept with waitlist*, or deny an inmate's assignment to the SAM Unit.

13

> If the inmate is accepted, the Psychology Associate Senior at CCS or designee will approve the inmate's admission into the SAM Unit and finalize the ICA's recommendation for transfer in VACORIS. . . . If the inmate is accepted with waitlist, the Psychology Associate Senior or designee will add the inmate to the statewide wait list for SAM Unit beds.

*Id.* (emphasis added). It is evident that even if an inmate is accepted, they may be placed on a waitlist.[7] The three Defendants (two mental health clinicians and a case counselor) correctly aver that each had no authority over custody assessments or housing assignments.

Further, it is not the province of this Court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995) ("[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). Affording deference and flexibility to prison officials is "especially warranted in the fine-tuning of the ordinary incidents of prison life." *Id*. *See Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008) ("prison officials should be accorded the widest possible deference in classifying prisoners' custodial status as necessary to maintain security and preserve internal order."); *see also Ferola v. Eagleton*, No. 9:15-2006-RBH-BM, 2016 WL 5844159, at *11 (D.S.C. Aug. 26, 2016) ("Classification and cell assignment issues are uniquely within the province of prison officials,

---

[7] The Sevent Circuit noted the dilemma that faces correctional institutions and those that make the decisions about cell assignments and potentially unsupported fears.

> Some prisoners are manipulative and cry "wolf" in an effort to have a cell to themselves or choose a favored cellmate. Other prisoners perceive specters in every shadow, even though their fears are unsupported. (There is, for example, no reason to think that the Latin Kings ever had it in for Riccardo. He did not belong to a rival gang, and there is no history of violent or overtly hostile encounters between Riccardo and any gang member.) Guards therefore must discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work.

*Riccardo*, 375 F.3d at 525.

and the Defendants cannot be held liable for classification and cell assignment decisions absent a specific known risk of harm to an inmate that they fail to address") (citations omitted), *report and recommendation adopted by* 2016 WL 5661704 (D.S.C. Sept. 30, 2016); *cf. In re Long Term Administrative Segregation of Inmates Designated as Five Percenter*s, 174 F.3d 464, 469 (4th Cir. 1999) ("Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

Consistent with these principles, Plaintiff had no constitutional right or protected interest in any particular prison classification, such as assignment to the SAM's Unit. *See, e.g.*, *Brooks v. Liptrot*, No. 1:12-cv-1405, 2012 WL 6125864, at *4 (E.D. Va. Dec. 7, 2012) ("[P]risoner classifications are discretionary matters of prison administration, [and] a prisoner cannot base a civil rights complaint on his . . . housing classification decision.") (citing *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978)); *Pevia v. Hogan,* 443 F. Supp. 3d 612, 634 (D. Md. 2020) (holding prisoners have no constitutional right "to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution"). For obvious reasons, courts have widely rejected any notion that a prisoner has any constitutional right to choose his cellmate. *See Murray v. Bledsoe*, 650 F.3d 246 (3d Cir. 2011) ( per curiam); *Allen v. Purkett*, 5 F.3d 1151, 1153 (8th Cir.1993); *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir.1984).

Here, the three Defendants did not know of any specific threat to Plaintiff and were not involved in the decision to place Plaintiff in the same cell as Brown; and Plaintiff never told anyone about the threat and sexual assaults until October 30, 2021, and at that time he was immediately removed from the cell with Brown and assigned to a different cell. The three Defendants' motion for summary judgment will be granted. *See, e.g.*, *Whaley v. Erickson*, 339 F. App'x 619, 622 (7th

Cir. 2009) (granting summary judgment for defendants where plaintiff "never told the defendants that [the inmate] had made specific threats to harm him, and he presented no evidence that any of the defendants knew about [the inmate's] purported propensity for violence").

## V. Conclusion

For the reasons outlined above, and through an Order that will be issued alongside this Memorandum Opinion, the three Defendants' Motion for Summary Judgment, Dkt. 34, will be **GRANTED**, and Plaintiff's Motion to Dismiss the Motion for Summary Judgment, Dkt. 39, will be **DENIED**.

Entered this 26th day of February, 2025.

Alexandria, Virginia

/s/
Rossie D. Alston, Jr.
United States District Judge